**IN THE UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF OHIO
EASTERN DIVISION**

| | |
|---|---|
| KEVIN E. OCHS, | CASE NO. 1:25-CV-01117-BMB |
| Plaintiff, | JUDGE BRIDGET M. BRENNAN |
| vs. | MAGISTRATE JUDGE DARRELL A. CLAY |
| COMMISSIONER OF SOCIAL SECURITY ADMINISTRATION, | **REPORT AND RECOMMENDATION** |
| Defendant. | |

### INTRODUCTION

Plaintiff Kevin Ochs challenges the Commissioner of Social Security's decision denying supplemental security income (SSI) benefits. (ECF #1). The District Court has jurisdiction under 42 U.S.C. §§ 1383(c) and 405(g). This matter was referred to me under Local Civil Rule 72.2 to prepare a Report and Recommendation. (Non-document entry of May 30, 2025). For the reasons below, I recommend the District Court **REVERSE** and **REMAND** the Commissioner's decision for further proceedings consistent with this Report and Recommendation.

### PROCEDURAL BACKGROUND

Mr. Ochs applied for SSI in March 2023, alleging he became disabled that month. (Tr. 264). After his claim was denied initially and on reconsideration, Mr. Ochs requested a hearing before an administrative law judge. (Tr. 160-66, 168-75, 192). In March 2024, Mr. Ochs (represented by counsel) and a vocational expert (VE) testified before the ALJ. (Tr. 35-58). In April 2024, the ALJ determined Mr. Ochs was not disabled. (Tr. 15-34). The Appeals Council denied

1

Mr. Ochs's request for review, so the ALJ's decision is the Commissioner's final decision. (Tr. 1-3; *see also* 20 C.F.R. § 416.1481). Mr. Ochs timely filed this action. (ECF #1).

FACTUAL BACKGROUND

**I.      Personal and Vocational Evidence**

Mr. Ochs was 40 years old on his alleged onset date and 41 years old at the administrative hearing. (*See* Tr. 160). He was enrolled in high school for two years but rarely attended class. (Tr. 299). He later obtained his GED. (Tr. 383). Mr. Ochs has no past relevant work. (Tr. 28).

**II.     Medical Evidence[1]**

Mr. Ochs has a history of anxiety, bipolar disorder, borderline personality disorder, and post-traumatic stress disorder (PTSD). (Tr. 371). In need of medication management, Mr. Ochs attended a telehealth appointment at LifeStance Health in September 2021. (Tr. 596). During his diagnostic evaluation, Mr. Ochs reported feeling "pretty much stable" on medications but endorsed anxiety with panic attacks, waking during the night, feeling tired even after sleeping, and having nightmares four to five times a week. (Tr. 596, 598). During the assessment, Mr. Ochs was euthymic with full affect with no observed abnormalities in thought process, memory, attention, judgment, or insight. (Tr. 599). At his request, his medications were adjusted. (*Id.*). Later that month, Mr. Ochs reported sleeping well but feeling more depressed and having some minor panic attacks. (Tr. 601). His medications were again adjusted. (Tr. 604).

On October 7, 2021, Mr. Ochs visited the emergency department for increased depression and anxiety with suicidal ideation. (Tr. 381). There, he endorsed a history of self-harm, increased

---

[1]      Apart from a week-long hospital admission, the record shows Mr. Ochs presented exclusively for telehealth appointments.

paranoia, and feelings of hopelessness and worthlessness. (*Id.*). He explained he served four years in prison and was struggling with paranoid thoughts and isolating more since his release. (Tr. 381-82). Mr. Ochs was hospitalized for seven days during which his treatment team adjusted his medications. (Tr. 390). At discharge, Mr. Ochs was taking prazosin, propranolol, trazodone, Vistaril, and Wellbutrin XL.[2] (Tr. 390-91).

In March 2022, Mr. Ochs switched providers at LifeStance Health to nurse practitioner Marissa Nicole Ragon. (Tr. 606). During the first appointment with NP Ragon, Mr. Ochs endorsed anxiety, irritability, and mood swings. (*Id.*). He also reported longtime symptoms of social phobia including an intense fear of leaving home, being in public, and interacting socially. (*Id.*). NP Ragon determined Mr. Ochs's presentation and history of symptoms were consistent with bipolar disorder, social phobia, generalized anxiety disorder, and PTSD. (Tr. 610). She prescribed lithium and continued his other medications.[3] (Tr. 609).

The next month, Mr. Ochs denied feeling depressed and endorsed slightly less severe anxiety in general, but reported severe social anxiety, PTSD, panic attacks, poor sleep, and being

---

[2] Prazosin is an alpha-blocker sometimes used to address sleep issues associated with PTSD. *Prazosin, MedlinePlus,* http://medlineplus.gov/druginfo/meds/a682245.html (last accessed May 18, 2026). Propranolol is a beta blocker sometimes used to treat anxiety. *Propranolol, MedlinePlus,* http://medlineplus.gov/druginfo/meds/a682607.html (last accessed May 18, 2026). Trazodone is a serotonin modulator used to treat depression. *Trazodone, MedlinePlus,* http://medlineplus.gov/druginfo/meds/a681038.html (last accessed May 18, 2026). Vistaril is the brand name for hydroxyzine, an antihistamine used to relieve anxiety and tension. *Hydroxyzine, MedlinePlus,* http://medlineplus.gov/druginfo/meds/a682866.html (last accessed May 18, 2026). Wellbutrin XL is the brand name for bupropion, an antidepressant used to treat depression. *Bupropion, MedlinePlus,* http://medlineplus.gov/druginfo/meds/a695033.html (last accessed May 18, 2026).

[3] Lithium-based medications are used to treat and prevent mania in people with bipolar disorder. *See Lithium, MedlinePlus,* http://medlineplus.gov/druginfo/meds/a681039.html (last accessed May 18, 2026).

startled by loud noises. (Tr. 611). NP Ragon prescribed Remeron and continued his other medications.[4] (Tr. 613).

In May 2022, Mr. Ochs described less severe anxiety and depression and less frequent mood swings but endorsed severe symptoms of social anxiety and PTSD. (Tr. 652). NP Ragon increased Remeron and prescribed Luvox.[5] (Tr. 617).

On June 30, 2022, Mr. Ochs reported feeling "closer to stable," with less severe depression and anxiety and fewer mood swings. (Tr. 619). NP Ragon increased his dosage of Luvox. (Tr. 621).

Those improvements continued into July 2022, when Mr. Ochs reported feeling less anxious "generally and socially," and denied feeling depressed. (Tr. 623). He described excessive daytime sleepiness shortly after increasing Luvox. (*Id.*). NP Ragon reduced Remeron and directed Mr. Ochs to take Luvox in the evening. (Tr. 625). Mr. Ochs felt more anxious later that month after his grandfather died. (Tr. 627). NP Ragon noted: "Luvox is proving to be effective for reducing social phobia/anxiety symptoms. This is evidenced by his ability to tolerate being around many people at his grandfather's funeral." (*Id.*). Mr. Ochs described "slightly less severe" daytime sleepiness with the reduced dose of Remeron. (*Id.*). NP Ragon further reduced the dosage of Remeron to address the side effects. (Tr. 629).

In August 2022, Mr. Ochs endorsed mild depression and more intense anxiety that causes increased irritability, but reported Remeron was effective for sleep and he was not overly drowsy

---

[4] Remeron is the brand name for mirtazapine, an antidepressant used to treat depression. *Mirtazapine, MedlinePlus*, http://medlineplus.gov/druginfo/meds/a697009.html (last accessed May 18, 2026).

[5] Luvox is the brand name for fluvoxamine, a selective serotonin reuptake inhibitor used to treat social anxiety disorder (extreme fear of interacting with others or performing in front of others that interferes with normal life). *Fluvoxamine, MedlinePlus*, http://medlineplus.gov/druginfo/meds/a695004.html (last accessed May 18, 2026).

during the day. (Tr. 631). He was not socializing much because his friends were busy but looked forward to celebrating his birthday with them the following week. (*Id.*). NP Ragon noted his typical presentation, including full affect, appropriate grooming and hygiene, logical thought process, good memory, intact attention span, and good judgment and insight. (Tr. 632).

By October 2022, Mr. Ochs was "extremely bored and depressed," in part because his friend was working more hours, so he was not socializing much. (Tr. 635). He described mild-to-moderate anxiety and PTSD. (*Id.*). NP Ragon increased lithium and continued his other medications. (Tr. 637). Later that month, Mr. Ochs reported feeling less depressed and anxious with the lithium increase. (Tr. 639). He described the symptoms of social phobia as less bothersome because he was not leaving home often. (*Id.*). NP Ragon continued his prescriptions. (Tr. 641).

In December 2022, Mr. Ochs reported some anxiety, mild-to-moderate depression, manageable symptoms of social phobia, and decreased sleep quality. (Tr. 680). NP Ragon directed Mr. Ochs to take melatonin at bedtime to address sleep quality. (Tr. 682).

The next month, Mr. Ochs was still sleeping poorly and felt moderately depressed. (Tr. 684). He endorsed moderate symptoms of social phobia and reported his PTSD symptoms fluctuate based on his exposure to triggers. (Tr. 684). He also reported tremors and numbness in his hands and feet. (*Id.*). Because those are symptoms of vitamin deficiency, NP Ragon prescribed vitamin B12 and D and continued the rest of his medications. (Tr. 686).

By early March 2023, the tremors had stopped. (Tr. 694). Mr. Ochs reported mild-to-moderate anxiety and depression, moderate PTSD, and moderate-to-severe social phobia. (*Id.*). NP Ragon continued his medications. (Tr. 696).

In April 2023, Mr. Ochs reported continued depression, anxiety, social phobia, PTSD, and poor sleep. (Tr. 688). NP Ragon increased Remeron and continued his other medications. (Tr. 690).

The next month, Mr. Ochs reported Remeron caused symptoms of restless leg syndrome, disturbing his sleep. (Tr. 702). He also reported less severe depression and anxiety, noting he was not leaving home often so social phobia had "been less of an issue." (*Id.*). NP Ragon stopped Remeron and prescribed trazodone for sleep. (Tr. 704).

In June 2023, Mr. Ochs reported mild-to-moderate depression and anxiety and moderate-to-severe PTSD and symptoms of social phobia. (Tr. 706). He was sleeping better with trazodone. (*Id.*). NP Ragon continued his medications. (Tr. 708).

In August 2023, Mr. Ochs reported similar symptoms and complained of difficulty filtering out environmental stimuli leading to easy distraction and overstimulation. (Tr. 726). He also described zoning out during conversation, difficulty sitting still, and misplacing items. (*Id.*). Dr. Ragon described his attention span as moderately impaired and prescribed Strattera.[6] (Tr. 726, 728).

By September 2023, Strattera had effectively reduced the severity of Mr. Ochs's symptoms: he felt more focused, could remain still for longer durations, and could maintain focus to start and complete tasks. (Tr. 730). He did not feel depressed "at all" and described mild anxiety. (*Id.*). NP

---

[6]     Strattera is the brand name for atomoxetine, a selective norepinephrine reuptake inhibitor used to increase the ability to pay attention and decrease impulsiveness and hyperactivity in those with ADHD. *Atomoxetine, MedlinePlus*, http://medlineplus.gov/druginfo/meds/a603013.html (last accessed May 18, 2026).

Ragon could not assess his social phobia "because he rarely leaves home." (*Id.*). She increased Strattera and continued his other medications. (Tr. 732).

By October 2023, Mr. Ochs denied feeling depressed or anxious, described the symptoms of PTSD as "more manageable," and reported Strattera was effective, but noted persisting symptoms of social phobia. (Tr. 738). The next month, Mr. Ochs continued to deny depressive symptoms but noted his anxiety was "all over the place." (Tr. 742). Symptoms of social phobia continued to be "less of a concern" because he does not leave home often. (*Id.*). NP Ragon continued his medications. (Tr. 744).

### III.    Opinion Evidence

In May 2023, state agency psychological evaluator Clare McGinness, Ph.D., reviewed Mr. Ochs's mental health records and determined he has *mild* limitations in understanding, remembering, or applying information and concentrating, persisting, or maintaining pace; a *moderate* limitation in adapting or managing himself; and a *marked* limitation in interacting with others. (Tr. 162). She concluded Mr. Ochs "is capable of complex tasks within a small group of co-workers and without public contact in a low stress work environment." (Tr. 163) (cleaned up).

In September 2023, state agency psychological evaluator Aroon Suansilppongse, M.D., reviewed the case file and explained the following:

- The claimant can understand and remember simple instructions.

- The claimant can carry out simple instructions. His anxiety and depression would occasionally interfere with his ability for sustained concentration, persistence, or task completion but can complete tasks at an acceptable pace.

- The claimant's social avoidance, paranoid tendencies, and infrequent episodes of impulsive or antisocial behavior would occasionally interfere with his ability to interact appropriately with supervisors, coworkers, or the public but he can complete tasks if he has infrequent contact with others.

- The claimant's anxiety and depression would occasionally interfere with his ability to set realistic goals or make plans independently of others.

- The claimant has the mental capacity for simple work-related activity involving one to two-step tasks.

(Tr. 170).

In March 2024, NP Ragon completed a mental impairment questionnaire about how Mr. Ochs's conditions impact his ability to work. (Tr. 751-54). NP Ragon first listed Mr. Ochs's signs and symptoms, including:

(1) anhedonia or pervasive loss of interest in almost all activities;
(2) depressed energy;
(3) blunt, flat, or inappropriate affect;
(4) feelings of guilt or worthlessness;
(5) generalized persistent anxiety;
(6) mood disturbance;
(7) difficulty thinking or concentrating;
(8) recurrent and intrusive recollections of a traumatic experience, which are a source of marked distress;
(9) psychomotor agitation or retardation;
(10) pathological dependence, persistent disturbance of mood or affect;
(11) apprehensive expectation;
(12) paranoid thinking or inappropriate suspiciousness;
(13) seclusiveness or autistic thinking;
(14) emotional withdrawal or isolation;
(15) bipolar syndrome with a history of episodic periods manifested by the full symptomatic picture of both manic and depressive syndromes (and currently characterized by either or both syndromes);
(16) persistent irrational fear of a specific object, activity, or situation which results in a compelling desire to avoid the dreaded object, activity, or situation;
(17) hyperactivity;
(18) emotional lability;
(19) deeply ingrained, maladaptive patterns of behavior;
(20) vigilance and scanning;
(21) easy distractibility; and
(22) sleep disturbance.

8

(Tr. 752). NP Ragon opined Mr. Ochs has a *marke*d limitation in understanding, remembering, and applying information and *extreme* limitations in the other three functional domains. (Tr. 753). She indicated he had no ability to function independently outside the area of his home and his impairments would cause him to miss work more than four days each month. (Tr. 753-54).

## IV.     Testimonial Evidence

At the administrative hearing, through his counsel, Mr. Ochs argued he cannot effectively function in society. (Tr. 40). He never obtained a driver's license, so he relies on two married friends for social support and transportation. (Tr. 40, 42). Even so, he sometimes avoids answering the door even when, for example, he asks them to drive him somewhere. (*Id.*). He does not manage his mail and does not answer or return phone calls, even from his attorney. (Tr. 41).

On a typical day, Mr. Ochs gets up, eats breakfast, takes his medications, and watches television. (Tr. 45). He only leaves the house to take out the trash, go to the store, or visit his elderly mother once a month. (*Id.*). He orders groceries online and prepares easy meals, like ramen. (Tr. 46). Mr. Ochs enjoys video games but does not play against other people. (*Id.*). He stays in his house (his "safe place") because he is afraid the police are going to arrest him and take him back to prison. (Tr. 48). He checks his doors and windows when he hears "any little noise" to make sure no one is trying to get into his house. (*Id.*). Mr. Ochs struggles to be around people he does not know. (Tr. 49). He expressed feeling shaky during the in-person hearing because he did not know anyone present. (*Id.*).

### STANDARD FOR DISABILITY

Eligibility for benefits is predicated on the existence of a disability. 42 U.S.C. § 423(a). "Disability" is defined as the "inability to engage in any substantial gainful activity by reason of any

9

medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." *Id.* § 1382c(a)(3)(A); *see also* 20 C.F.R. § 416.905(a).

The Commissioner follows a five-step evaluation process—found at 20 C.F.R. § 416.920—to determine whether a claimant is disabled:

1.  Was claimant engaged in a substantial gainful activity?

2.  Did claimant have a medically determinable impairment, or a combination of impairments, which is "severe," defined as one which substantially limits an individual's ability to perform basic work activities?

3.  Does the severe impairment meet one of the listed impairments?

4.  What is claimant's residual functional capacity and can claimant perform past relevant work?

5.  Can claimant do any other work considering his or her residual functional capacity, age, education, and work experience?

Under this sequential analysis, the claimant has the burden of proof through Step Four. *See Walters v. Comm'r of Soc. Sec.*, 127 F.3d 525, 529 (6th Cir. 1997). The burden shifts to the Commissioner at Step Five to prove whether the claimant has the residual functional capacity (RFC) to perform available work in the national economy. *Id.* The ALJ considers the claimant's RFC, age, education, and past work experience to determine whether the claimant could perform other work. *Id.* Only if a claimant satisfies each element of the analysis, including inability to do other work, and meets the duration requirements, is the claimant deemed disabled. 20 C.F.R. § 416.920(c)-(f); *see also Walters*, 127 F.3d at 529.

### THE ALJ'S DECISION

At Step One, the ALJ determined Mr. Ochs had not engaged in any substantial gainful activity since March 23, 2023, the application date. (Tr. 20). At Step Two, the ALJ identified

depressive disorders, anxiety disorders, PTSD, and ADHD as severe impairments. (*Id.*). At Step

Three, the ALJ found Mr. Ochs's impairments did not meet or medically equal the requirements

of a listed impairment. (*Id.*). At Step Four, the ALJ determined Mr. Ochs's RFC as follows:

> After careful consideration of the entire record, I find that the claimant has the
> residual functional capacity to perform a full range of work at all exertional levels but
> with the following nonexertional limitations: occasionally interact with supervisors
> and coworkers; never interact with the public; and can adapt to routine workplace
> changes.

(Tr. 23). The ALJ then found Mr. Ochs has no past relevant work. (Tr. 28). At Step Five, the ALJ

determined Mr. Ochs can perform work as a cleaner II, kitchen helper, or industrial cleaner. (Tr.

29).

### STANDARD OF REVIEW

In reviewing the denial of Social Security benefits, the court "must affirm the

Commissioner's conclusions absent a determination that the Commissioner has failed to apply the

correct legal standards or has made findings of fact unsupported by substantial evidence in the

record." *Walters*, 127 F.3d at 528. The Commissioner's findings "as to any fact if supported by

substantial evidence shall be conclusive." *McClanahan v. Comm'r of Soc. Sec.*, 474 F.3d 830, 833

(6th Cir. 2006) (citing 42 U.S.C. § 405(g)). "Substantial evidence" is "more than a scintilla of

evidence but less than a preponderance and is such relevant evidence as a reasonable mind might

accept as adequate to support a conclusion." *Besaw v. Sec'y of Health & Hum. Servs.*, 966 F.2d 1028,

1030 (6th Cir. 1992). But "a substantiality of evidence evaluation does not permit a selective

reading of the record. Substantiality of evidence must be based upon the record taken as a whole.

Substantial evidence is not simply some evidence, or even a great deal of evidence. Rather, the

substantiality of evidence must take into account whatever in the record fairly detracts from its weight." *Brooks v. Comm'r of Soc. Sec.*, 531 F.App'x 636, 641 (6th Cir. 2013) (cleaned up).

In determining whether substantial evidence supports the Commissioner's findings, the court does not review the evidence de novo, make credibility determinations, or weigh the evidence. *Brainard v. Sec'y of Health & Hum. Servs.*, 889 F.2d 679, 681 (6th Cir. 1989). Even if substantial evidence (or indeed a preponderance of the evidence) supports a claimant's position, the court cannot overturn "so long as substantial evidence also supports the conclusion reached by the ALJ." *Jones v. Comm'r of Soc. Sec.*, 336 F.3d 469, 477 (6th Cir. 2003). This is because there is a "zone of choice" within which the Commissioner can act, without fear of court interference. *Mullen v. Bowen*, 800 F.2d 535, 545 (6th Cir. 1986).

Apart from considering whether substantial evidence supports the Commissioner's decision, the court must determine whether proper legal standards were applied. The failure to apply correct legal standards is grounds for reversal. *Walters,* 127 F.3d at 528. Even if substantial evidence supports the ALJ's decision, the court must overturn when an agency does not follow its own regulations and thereby prejudices or deprives the claimant of substantial rights. *Wilson v. Comm'r of Soc. Sec.*, 378 F.3d 541, 546-47 (6th Cir. 2004).

Finally, a district court cannot uphold an ALJ's decision, even if there "is enough evidence in the record to support the decision, [where] the reasons given by the trier of fact do not build an accurate and logical bridge between the evidence and the result." *Fleischer v. Astrue*, 774 F.Supp.2d 875, 877 (N.D. Ohio 2011) (internal quotations omitted); *accord Shrader v. Astrue*, No. 11-13000, 2012 WL 5383120, at *6 (E.D. Mich. Nov. 1, 2012) ("If relevant evidence is not mentioned, the Court cannot determine if it was discounted or merely overlooked.").

12

## DISCUSSION

The sole issue Mr. Ochs raises is whether the ALJ erred in his evaluation of NP Ragon's medical opinion, specifically NP Ragon's conclusions that Mr. Ochs (i) is extremely limited in his ability to interact with others, and (ii) would miss work four or more days a month. (ECF #8 at PageID 792).

At Step Four, the ALJ must determine a claimant's RFC by considering all relevant medical and other evidence. 20 C.F.R. § 416.920(e). As part of that assessment, the ALJ must review all medical opinions and prior administrative findings and explain their persuasiveness. *See* 20 C.F.R. § 416.920c(b); *see also Reeves v. Comm'r of Soc. Sec.*, 618 F.App'x 267, 275 (6th Cir. 2015). The ALJ considers five factors to determine persuasiveness: (1) supportability; (2) consistency; (3) the source's relationship with the claimant, including length of treatment relationship, frequency of examinations, purpose of the treatment relationship, and examining relationship; (4) the source's specialization; and (5) any other factors that tend to support or contradict a medical opinion. 20 C.F.R. § 416.920c(c)(1)-(5). The regulations require the ALJ to "explain how [the ALJ] considered the supportability and consistency factors for a medical source's medical opinions," those being the two most important factors. *See id.* § 416.920c(b)(2). *Supportability* is "the extent to which a medical source's opinion is supported by relevant objective medical evidence and the source's supporting explanation"; *consistency* is "the extent to which the opinion is consistent with evidence from other medical sources and nonmedical sources in the claim." *Revisions to Rules Regarding the Evaluation of Medical Evidence*, 82 F.R. 5844-01, 5859, 2017 WL 168819 (Jan. 18, 2017). The ALJ's explanation should "generally include[ ] an assessment of the supporting objective medical evidence and other medical evidence, and how consistent the medical opinion or

13

prior administrative medical finding is with other evidence in the claim." *Id.*; *see also* 20 C.F.R.

§ 415.920c(b)(2) ("we will explain how we considered the supportability and consistency factors").

The reasons for the ALJ's conclusions must be stated in a manner that allows the reviewing court

to "trace the path of the ALJ's reasoning" from evidence to conclusion. *Stacey v. Comm'r of Soc. Sec.*,

451 F.App'x 517, 519 (6th Cir. 2011). If the ALJ discusses both consistency and supportability and

the discussion is supported by substantial evidence, the reviewing court may not disturb the ALJ's

findings. *Paradinovich v. Comm'r of Soc. Sec.*, No. 1:20-cv-1888, 2021 WL 5994043, at *7 (N.D. Ohio

Sept. 28, 2021), *report and recommendation adopted*, 2021 WL 5119354 (N.D. Ohio Nov. 4, 2021).

> Here, the ALJ determined NP Ragon's opinion was not persuasive, explaining as follows:

> Nurse Practitioner Ragon opined that the claimant has marked limitations in understanding, remembering, or applying information; and extreme limitations in interacting with others, concentrating, persisting, or maintaining pace, and adapting or managing oneself. She further found that the claimant's anxiety disorder makes the claimant unable to function independently outside of his home. Additionally, she opined that the claimant would be absent more than four days per month from work. I find this opinion is not persuasive because it is not supported by, or consistent with, the more complete medical record. Aside from findings related to mood and affect, the more complete medical record contains generally unremarkable examination findings. These examination findings, as well as the more complete record noted above, do not support the extent of limitations suggested by this opinion.

(Tr. 28) (cleaned up).

This single paragraph of analysis does not permit meaningful judicial review of the ALJ's

decision for substantial evidence. The ALJ "has the obligation in the first instance to show his or

her work, *i.e.*, to explain in detail how the factors actually were applied in each case, to each

medical source." *Hardy v. Comm'r of Soc. Sec.*, 554 F.Supp.3d 900, 909 (E.D. Mich. 2021).

"Resorting to boilerplate language to support a finding of unpersuasiveness does not satisfy that

obligation." *Id.* The ALJ did not properly articulate how he considered the supportability and

14

consistency of NP Ragon's opinion because he did not assess the evidence supporting her opinion or how consistent the opinion is with other evidence in the record. But that is not the end of the analysis.

If the ALJ does not articulate how he considered the persuasiveness of a medical opinion, the reviewing court must look to the rest of the decision for support. *See Crum v. Comm'r of Soc. Sec.*, 660 F.App'x 449, 457 (6th Cir. 2016) (looking elsewhere in the decision for factual conclusions supporting ALJ's opinion-evidence analysis); *Bledsoe v. Barnhart*, 165 F.App'x 408, 411 (6th Cir. 2006) (noting the ALJ need not "spell out every fact a second time"). Therefore, in assessing whether substantial evidence supports the determination that NP Ragon's opinion was not persuasive, I must consider the ALJ's factual findings made elsewhere in the decision about Mr. Ochs's ability to interact with others and leave his home.

At Step Three, the ALJ determined Mr. Ochs has a marked limitation in interacting with others:[7]

> In interacting with others, the claimant has a marked limitation. The claimant reported that he has increased anxiety when he goes out alone and fears someone is looking at or following him. He further indicated that he is afraid of police and authority figures, but that he is able to get along with his landlord. The claimant testified that at times he does not answer the door for friends and that he prefers to be alone. Throughout the record, the claimant further reported social phobia symptoms, such as intense fear of being in public, leaving home, interacting socially; panic attacks triggered by being in public or social interactions; worries about being judged or making mistakes; and extreme fear of being humiliated in public. While the claimant reported that these symptoms fluctuated, he generally rated his social phobia from moderate to severe. At one examination, the claimant made intermittent eye contact. He also presented with an irritable mood and a blunted and restricted affect. The claimant was noted to appear to struggle with adjusting to

---

[7] A marked limitation means the claimant's ability to function independently, appropriately, effectively, and on a sustained basis in that area is seriously limited. 20 C.F.R. § 416.920a(e)(2)(i). An extreme limitation means the claimant cannot function independently, appropriately, effectively, and on a sustained basis in that area. *Id.* § 416.926a(e)(3)(i).

15

outside activities. He also appeared to have poor social skills. Moreover, despite the relatively stressful nature of the hearing, the claimant does not appear to have significant difficulty interacting with me or counsel. These examination findings, subjective reports, and hearing observations support that the claimant has experienced serious limitations with respect to interacting with others on an independent, appropriate, effective, and sustained basis.

(Tr. 21) (citations omitted). Next, in summarizing the evidence, the ALJ again noted Mr. Ochs's reported social-phobia symptoms, other findings showing abnormal mood (depressed, anxious, or irritable) and affect (sullen, blunted, or restricted), and other "generally unremarkable" findings on mental status examination:

[T]hroughout the record, the claimant demonstrated a full and appropriate affect. Additionally, he was animated; appropriate; calm; cooperative; engaged; and made intermittent eye contact. Further, he was regularly focused on examination, with an intact attention span and memory. Additionally, the claimant routinely displayed unimpaired judgment and good insight throughout the record. Moreover, he was regularly alert and oriented, with no loose associations and demonstrated a logical, goal-directed, and organized thought process. His mood was regularly euthymic.

(Tr. 25) (citations omitted). The ALJ then determined Mr. Ochs's statements about the effect of his social phobia were not consistent with findings that he was animated, appropriate, calm, cooperative, engaged, and made intermittent eye contact when interacting with his treating providers. (Tr. 26). Last, the ALJ determined the state agency consultative evaluators' opinions on Mr. Ochs's ability to interact with others were supported by and consistent with the "more complete medical record." (Tr. 27-28).

Even after looking elsewhere in the decision for support, I find substantial evidence[8] does not support the ALJ's conclusion. Several reasons compel this determination.

---

[8] Substantial evidence is "more than a scintilla of evidence but less than a preponderance" and is the evidence "a reasonable mind might accept as adequate to support a conclusion." *Besaw*, 966 F.2d at 1030.

16

First, the ALJ relies largely on mental status examination findings to justify his determinations on the persuasiveness of all the medical opinions of record. (Tr. 27-28). But mental status examination findings suggesting Mr. Ochs could interact sufficiently with his treating providers do not correlate with an ability to interact with coworkers, supervisors, or the general public.[9] *See, e.g.*, *Kelli S. v. Comm'r of Soc. Sec.*, No. CV 25-10724, 2026 WL 579621, at *5 (E.D. Mich. Mar. 2, 2026) (holding ALJ's single sentence about the claimant's ability to interact with treating providers, "which interactions occur in a unique and controlled setting that in many respects is unlike the workplace," is not substantial evidence supporting the ALJ's persuasiveness finding); *Sanders v. Comm'r of Soc. Sec.*, No. 19-cv-13280, 2021 WL 1056816, at *4 (E.D. Mich. Mar. 19, 2021) ("[T]he fact that a patient may be able to interact *with her doctors*, says very little, if anything, about that individual's ability to function *in the workplace*.") (emphasis in original); *Daugherty v. Comm'r of Soc. Sec.*, No. 1:16-cv-898, 2017 WL 3987867, at *8 (S.D. Ohio July 20, 2017), *report and recommendation adopted*, 2017 WL 3965326 (S.D. Ohio Sept. 8, 2017) (noting that "relationships with [plaintiff's] medical providers are not equivalent to the type of social interactions plaintiff would encounter in the workplace."). Though not dispositive, a claimant's ability to interact with family or medical providers may be a relevant factor to consider, among others, in determining a claimant's functional ability to interact in the workplace. *See, e.g., Ellis v.*

---

[9] "Interacting with others" is an area of mental functioning that refers to the abilities to relate to and work with supervisors, coworkers, and the public. *Listing of Impairments*, 20 C.F.R. Pt. 404, Subpt. P, App'x 1, § 12.00E(2). Examples include cooperating with others; asking for help when needed; handling conflicts with others; stating own point of view; initiating or sustaining conversation; understanding and responding to social cues (physical, verbal, emotional); responding to requests, suggestions, criticism, correction, and challenges; and keeping social interactions free of excessive irritability, sensitivity, argumentativeness, or suspiciousness. *Id.*

17

*Comm'r of Soc. Sec.*, No. 3:20-cv-469, 2021 WL 9526868, at *9 (E.D. Tenn. Dec. 14, 2021); *Nicholas B. v. O'Malley*, No. 3:24-cv-169, 2025 WL 597085, at *5 (W.D. Ky. Feb. 7, 2025), *report and recommendation adopted*, 2025 WL 595176 (W.D. Ky. Feb. 24, 2025) (holding that ALJ's focus only on claimant's limited interactions with his medical providers did not provide appropriate support for conclusion that claimant would be moderately limited in workplace interaction).

Second, as the ALJ acknowledged, Mr. Ochs's social phobia is limited to specific situations: "intense fear about being in public, leaving home, and interacting socially; panic attacks triggered by being in public or social interactions; worries about being judged or making mistakes; and extreme fear of being humiliated in public." (Tr. 21). Mr. Ochs exclusively scheduled telehealth appointments with NP Ragon and attended from the comfort of his residence. His visits with NP Ragon did not require him to leave home, be in public, or interact socially. When considered in the appropriate context, normal findings on mental status examination might be expected. But the ALJ does not explain how those mental status findings contradict NP Ragon's opinions on the severity of Mr. Ochs's social phobia. Without that explanation, it remains unclear how Mr. Ochs's ability to function in situations that do not trigger his specific fears (such as interacting *from home* with his psychiatrist via telehealth) is inconsistent with NP Ragon's opinion that Mr. Ochs is extremely limited in his ability to interact with others *in the workplace*. Thus, the mental status findings are not adequate support for the ALJ's decision to discount NP Ragon's opinion because they are not correlated with Mr. Ochs's ability to interact with coworkers, supervisors, or the general public and, when placed in context, are not inconsistent with social phobia.[10]

_____

[10]     Mr. Ochs does not raise the point, but the ALJ also determined his alleged symptoms of social phobia are inconsistent with those normal mental status examinations

Next, the other evidence the ALJ cited in support for concluding that Mr. Ochs does not have an extreme limitation in interacting with others is the ALJ's observation that Mr. Ochs did not have significant difficulty interacting with the ALJ or his own attorney during the administrative hearing. While the ALJ's reliance on his personal observation of Mr. Ochs in the hearing is a "material, relevant, and admissible" factor, it cannot be the sole basis for the ALJ's conclusion. *See Sorrell v. Comm'r of Soc. Sec.,* 656 F.App'x 162, 171-72 (6th Cir. 2016) (noting that where the ALJ relies solely on personal observations of the claimant's apparent pain level, "the ALJ has employed the infamous and thoroughly discredited 'sit and squirm' test") (internal quotation omitted); *see also Henley v. Berryhill,* No. 17-CV-445-FPG, 2018 WL 3866670, at *5 (W.D.N.Y. Aug. 15, 2018) (noting that the "sit and squirm" test "is particularly troubling in the mental health context, where the SSA recognizes the '[n]eed for longitudinal evidence,' because mental disabilities 'are best diagnosed over time'") (citations omitted). Thus, because Mr. Ochs's ability to interact with his doctors is not substantial evidence, the fact he "does not appear to have significant difficulty interacting with [the ALJ] or [his] counsel" (Tr. 21), is not, on its own, substantial evidence.

The limited interactions in medical appointments and the in-person administrative hearing, even when considered together as part of a whole record, do not constitute substantial evidence supporting the ALJ's conclusion to discount NP Ragon's opinion on interacting with

---

(animated, appropriate, calm, cooperative, engaged, and making intermittent eye contact) and, on that basis alone, discounted the alleged severity of his social phobia symptoms. (Tr. 26). ALJs are entitled to consider objective medical evidence when evaluating a claimant's statements about the intensity, persistence, and limiting effects of symptoms but may not disregard those statements *solely* because the objective evidence does not substantiate the degree of impairment-related symptoms alleged. Soc. Sec. Ruling (SSR) 16-3p, 2017 WL 5180304, at *5 (Oct. 25, 2017).

others. "[T]he substantiality of evidence must take into account whatever in the record fairly detracts from its weight." *Brooks*, 531 F.App'x at 641. Both medical appointments and an in-person hearing are not at all like a normal workplace. Thus Mr. Ochs's functioning in those contexts would not necessarily carry over to work. To the extent it might carry over, Mr. Ochs described he was "shaking" during the in-person hearing because he did not know anyone. (Tr. 49). Thus, the limited interactions with his treating providers and the ALJ's one-time observation do not constitute substantial evidence supporting the ALJ's conclusion to discount NP Ragon's opinion.

Last, the ALJ's analysis of the state agency opinions do not constitute substantial evidence supporting the ALJ's conclusion to discount NP Ragon's opinion on interacting with others. The ALJ found Dr. Suansilppongse's opinion to limit Mr. Ochs to working "with a small group of familiar coworkers without public contact." (Tr. 27). Although Dr. Suansilppongse's opined that (Tr. 173), the ALJ's reading is incomplete. Dr. Suansilppongse also wrote "[Medical Consultant]'s notes: see below," referring to the additional explanation of the RFC at the end of the section. (Tr. 173). There, Dr. Suansilppongse wrote "MC's notes: see 416," incorporating findings from the earlier section "416 – Medical Evaluation." (*See* Tr. 173-74). There, Dr. Suansilppongse additionally found Mr. Ochs is socially avoidant, has paranoid tendencies, and has infrequent episodes of impulsive or antisocial behavior and opined he "would be able to complete tasks with infrequent contact with others." (Tr. 170). Ordinarily the ALJ would have to address the findings in only the narrative RFC. *See Griffith v. Comm'r of Soc. Sec.*, 582 F.App'x 555, 563 (6th Cir. 2014); *Velez v. Comm'r of Soc. Sec.*, No. 1:09-cv-715, 2010 WL 1487599, at *6 (N.D. Ohio Mar. 26, 2010) (citing cases). But Dr. Suansilppongse's nested citations expressly incorporate into the narrative RFC the earlier findings. The ALJ does not address these incorporated limitations nor explain why

20

they were omitted from the RFC, which the ALJ was required to do. *See Kinney v. Comm'r of Soc. Sec.*, No. 23-3889, 2024 WL 2273365, at *3 (6th Cir. May 20, 2024); SSR 96-8p, 1996 WL 374184 at *7 (July 2, 1996) (if the ALJ's "RFC assessment conflicts with an opinion from a medical source, the [ALJ] must explain why the opinion was not adopted"). And a failure to follow agency rules and regulations denotes a lack of substantial evidence, even if the ALJ's conclusion may be otherwise justified based on the record. *Blakley v. Comm'r of Soc. Sec.*, 581 F.3d 399, 407 (6th Cir. 2009); *Kinney*, 2024 WL 2273365, at *3. Thus, the ALJ's reliance on Dr. Suansilppongse's opinion cannot impliedly support the ALJ's decision to reject NP Rangon's opined social limitations because the ALJ did not explain why he incorporated only some of Dr. Suansilppongse's opined social limitations.

On remand, the ALJ should reconsider the medical opinions and articulate how he considered the supportability and consistency of the opinions.

21

CONCLUSION AND RECOMMENDATION

Following review of the arguments presented, the record, and the applicable law, and for the reasons described, I recommend the District Court **REVERSE** the Commissioner's decision denying supplemental security income and **REMAND** for additional proceedings consistent with this recommendation.

Dated: May 19, 2026

_____
DARRELL A. CLAY
UNITED STATES MAGISTRATE JUDGE

OBJECTIONS, REVIEW, AND APPEAL

Within 14 days after being served with a copy of this Report and Recommendation, a party may serve and file specific written objections to the proposed findings and recommendations of the Magistrate Judge. *See* Fed. R. Civ. P. 72(b)(2); *see also* 28 U.S.C. § 636(b)(1); Local Civ. R. 72.3(b). Properly asserted objections shall be reviewed de novo by the assigned district judge.

Failure to file objections within the specified time may result in the forfeiture or waiver of the right to raise the issue on appeal, either to the district judge or in a subsequent appeal to the United States Court of Appeals, depending on how or whether the party responds to the Report and Recommendation. *Berkshire v. Dahl,* 928 F.3d 520, 530 (6th Cir. 2019). Objections must be specific and not merely indicate a general objection to the entirety of the Report and Recommendation; "a general objection has the same effect as would a failure to object." *Howard v. Sec'y of Health & Hum. Servs.,* 932 F.2d 505, 509 (6th Cir. 1991). Objections should focus on specific concerns and not merely restate the arguments in briefs submitted to the Magistrate Judge. "A reexamination of the exact same argument that was presented to the Magistrate Judge without specific objections 'wastes judicial resources rather than saving them and runs contrary to the purpose of the Magistrates Act.'" *Overholt v. Green,* No. 1:17-cv-186, 2018 WL 3018175, at *2 (W.D. Ky. June 15, 2018) (quoting *Howard,* 932 F.2d at 509). The failure to assert specific objections may in rare cases be excused in the interest of justice. *See United States v. Wandahsega,* 924 F.3d 868, 878-79 (6th Cir. 2019).

22